The next matter on our calendar is United States v. Attila. May it please the Court, John Elwood for Haakon Attila. For the very first time in the 40-year history of the International Emergency Economic Powers Act, the government here prosecuted a foreign national for conduct committed abroad for purportedly evading or avoiding the imposition of secondary sanctions, that is, sanctions on foreigners restricting access to U.S. markets based on a finding by the Secretary of the Treasury that they had improperly done business with Iran. For four reasons set forth in our brief, we think that was reversible error. With the limited time I have here today, I was planning, subject to the Court's questions, on focusing on our first issue in the brief, that is, whether this was even a crime, evasion or avoiding secondary sanctions, and the last issue, which is whether it was error to exclude extrinsic evidence of Zarab's jailhouse conversation. So to begin, it was demonstrably not a crime to evade or avoid the imposition of secondary sanctions. Consistent with the Treasury Department's own historic interpretation of the regulation at issue, it only referred to prohibitions that are already in place, not prohibitions that might yet be imposed. If the secondary sanctions had already been in place, would Mr. Attila, could he have been convicted of attempting to avoid the punishment of those secondary sanctions? I think that there is a second argument. We have two arguments why it's not a crime to evade or avoid secondary sanctions. One is it involves only existing prohibitions. We have a second argument that because there was no showing that this involved, the regulation refers to transactions, you know, subject by people or property that's subject to the jurisdiction of the United States. The government has never shown that Mr. Attila was subject to the jurisdiction of the United States because he's a foreigner. And there was never any, the jury was not required to make a finding that the property was subject to the jurisdiction of the United States. So I think that's a second argument. But I think it's even more compelling if you just focus on the fact that there was no prohibition in place. Now, if you look at, you know, the government argues that you have to give avoid a different meaning than evade or else there'd be surplusage. But that is simply not the case. This is kind of stock language. There's this evade or avoid, you know, attempt to violate, et cetera. It's stock language. It's used in, you know, scads of executive orders that are used for justice purpose. We cited four of them in our reply brief at page 17. One of them is available at page 101 of the special appendix, so you can look at it. But it's referring to, there it refers to any of the prohibitions set forth in this order. There are only existing prohibitions in the order, so it couldn't have had the meaning that the government tries to ascribe to it. And the government, of course, the Treasury knows about all of these other orders, which is why it's given the order the same interpretation or given the regulations the same interpretation that we have, that when you talk about prohibitions, it only refers to prohibitions that are already in place, not ones that could be imposed. The government says at page 38 to 39 of its brief, it concedes that for most of the verbs in the phrase that it is best understood to refer to existing prohibitions that have already been imposed, unquote, again at 38 to 39 of the government's brief. But, again, when you look at the fact that all of the other clues, it really is just a redundant couplet to use the phrase or redundant doublet to use the phrase that Scalia and Garner used, and that evade or avoid are both terms that are used to define each other, and they're set up by, within one comma. So it's like evade or avoid, attempts to violate, et cetera. And so you should interpret them, I think, together. At a minimum, that's a reasonable interpretation, unless you find that that's foreclosed by the, unambiguously foreclosed by the text of the regulation. I think you have to say it's at least a reasonable interpretation. If that's so, we should win under the rule of lenity. But, secondly, as Judge, then-Judge Kavanaugh said, it's rule of law 101 that you can't penalize somebody retroactively based on a new interpretation of a regulation, and that's exactly what the government is arguing for here. Well, is it a new interpretation? It is a new interpretation. If you look at page A780, the Department of the Treasury took the position up until essentially the government, the prostitution here overrode it for purposes of the, I think, the fourth superseding indictment, took the position that it only referred to existing prohibitions, and at a minimum that was the interpretation they took at the time that Mr. Attila did the conduct that's charged here. This was- Secondary sanctions in this case were never put in place because the argument is- They still haven't. They still haven't. Mr. Attila helped them avoid it. That's the government's theory, that he helped them avoid it. But even knowing all that they have, they still haven't imposed it today. No secondary sanctions ever on this hold? On Hope Bank or Zahrab. That's correct. This was not harmless error. The government tries to argue that because there are two ways they could have violated IEPA conspiracy, both primary sanctions and conspiracy to avoid secondary sanctions, that that was harmless error. But as we point out, even though he was committed of bank fraud, he was also acquitted of conspiracy- or I'm sorry, he was also acquitted of money laundering. And money laundering has two elements, bringing the money to the United States and violating one of those other crimes, bank fraud or IEPA conspiracy. So they're inherently inconsistent verdicts. And this court has said, and U.S. versus Moran Tawala said it in our brief, that, quote, inconsistency in the jury verdicts means that the court can do no more than try to guess which of the inconsistent verdicts is the one the jury really meant, unquote. We put that out in our opening brief. The government never responded to it. So in a way they forfeited the harmlessness of it. Did you move before the district court? Pardon me? Did you move before the district court about the inconsistent verdicts? Move to vacate the jury verdict? I'm not sure if we did or not. But, I mean, all we're saying here is that that is evidence that you can't say that this is harmless. This error was harmless beyond a reasonable doubt because of the inconsistent verdicts. You can't say they necessarily found that he brought this money to the United States. With the remaining time, I'd like to- That's as far as you're pushing the argument. I'm sorry, what? That's as far as you are pushing the argument. That's as far as we're pushing the inconsistent, inconsistency argument. Has Mr. Zahrab been tried yet? I'm sorry? Has Mr. Zahrab been tried? No, he has not. He has not. Is he still awaiting trial? You'd have to ask the government. I think so. That brings us to the second point, which is that the government has never explained why it was proper to withhold from jurors evidence that Zahrab lied to them about telling his uncle. In this system, quote, you have to admit to something you haven't done, unquote. Reza Zahrab was not just a witness. He wasn't even just a star witness. He was the glue that held this entire prosecution together. And I think it was highly relevant. He's the one that did the stuff. Exactly, exactly right. He was the ringleader for the entire thing, and he was the entire reason Mr. Attila was ever brought into this. It's highly significant because it's evidence that Zahrab was prepared to lie about the very transaction that was going on here. We think that extrinsic evidence was admissible under two theories. First, that it was not collateral, that under this court's decision in Blackwood and under Harvey, that evidence of a motive to lie is never collateral and it's always admissible. The court has reversed in Blum and in Harvey for failure to admit this kind of evidence. But what is your argument? He said you have to tell them what they want to hear. That's what he said. No, he said in this system you have to admit to something you haven't done. Right. So how does that help you? It shows that he is willing to lie in order to get a better sentence. And because Mr. Attila's liability is entirely derivative of Zahrab, he testified for six days about all the things he did wrong, and you know how he And so it is directly relevant. I mean, you might be able to say to the jury, you might be able to try to argue to the jury it wasn't relevant, but at a minimum this is the sort of thing that the jury should have had to make that consideration. Again, both as a – may I continue? Both to show because it's material to show whether he has a motive to falsify, but also because it's a prior inconsistent statement. Under Stewart last year, this court reversed for something that is much less inconsistent. There was, you know, a recorded conversation where somebody said, I served this up on a silver platter, you know, insider information. And they considered it a prior inconsistent statement that his father also testified he had been drinking a lot at the time. And this is – they said in Stewart that as long as it casts new light on it, that that is a prior inconsistency. Here it is diametrically opposed. He said, I didn't talk to my uncle about how you have to lie in this system. And, in fact, he did lie in this system. And I think that that is highly relevant under Stewart. I don't know how you could square the Stewart decision, which as an aside Judge Berman dissented sitting by designation. And I don't know how you could square Stewart with this case if you were to affirm in this case and you reversed in Stewart. And even though evidentiary rulings are reviewed for abuse of discretion, I think it's established in Stewart, they said so, that if you rely on a legal error, that is an abuse of discretion. And if you look at the district court's rationale, it was legal error. He said that it was excludable because Zahrab's alleged statements has nothing to do with whether there was a wide-scale plot to launder Iranian oil proceeds through Hulk Bank or whether Attila joined the plot. And also he faulted us. It was collateral. He said it was collateral because of that. And also he said we didn't raise it in our closing. But, of course, this court has said – they said in Harvey in 1972 that it was well established that extrinsic evidence is admissible to prove that a witness has a motive to testify falsely. What motive? I mean, how does it show a motive to testify falsely? Because he says in this system you have to admit to things you haven't done. And he specifically tied it to you have to – once you admit guilt, you're set free. That was two minutes later in the call, wasn't it? I think that at least – That seems to me that's what you've conflated. You in your question – I don't know if it was you or defense counsel, someone else, but the question was posed as two statements that are actually two minutes apart in the transcript. They're connected together, and he then denied. But I think he said absolutely not. He didn't say that wasn't quite right. And I think that this is a fair reading in any event because if you look at the government summary of this – and this is at page A777 – this is how the government summarizes this evidence. Quote, in such a country, in order to get out or get a reduced sentence, you need to admit to crimes you haven't committed. In America, in order to make it out of prison, you need to admit to something you haven't committed. So I don't think that you can say, oh, it was an unfair interpretation. It's exculpatory. It sounds exculpatory of Zahrab to say, I said I did it, but I may not have actually done it. Well, if it's exculpatory of Zahrab, it's exculpatory of Attila. A forciore. A forciore, exactly. He didn't say he did that. I mean, he's sort of speaking about this system, which he obviously has a low opinion of, but he doesn't say that he pleaded guilty to something he didn't do. Again, that would have been a fine explanation they could argue to the jury, but I think you have to at least say he has an incentive, he has a motive to falsify, and all you have to show in order to say that admissible evidence can be proven in is to say he has a motive to falsify. And he's talking about – What's the abuse of discretion? The abuse of discretion is he applied the wrong legal standard, Judge Berman did, and he said it was collateral because it didn't go to whether or not there actually was a conspiracy. And the fact of the matter is that it's well established, as the court said in 1972 in Harvey, that motive to falsify is never collateral. It's always you can prove it up through extrinsic evidence. He also said we didn't – he also made much of the fact that we didn't bring it up in our closing when we couldn't because there was no evidence. Zahrab denied it, and we weren't permitted to introduce evidence, so we couldn't have brought that up in our closing. It just shows it's kind of error upon error. Again, there's – But you're opening – I mean, I'm thinking about being in the position of the district court judge, but you're opening up this whole collateral proceeding where you spend a week arguing over what these words meant with various people being called as witnesses to try to figure it out. I don't think you have to do that. I think that you would make the argument to the jury about what it is. Zahrab would have an opportunity to say, oh, that's not what I meant, although I think that the jury would be – wouldn't be faulted if they discounted his claim, that's not what I meant, when he went to such lengths to try to hide it from the jury to begin with. He said, absolutely, I didn't testify to that. He didn't say, that's not quite right. And when you do that, I think that to say, as Judge Friendly said, the government's arguments, and this is the DeMaria case, that given the lengths that the government's gone to to try to keep the evidence away from the jury, it's hard to say that it wasn't consequential. And nobody tried to refresh his recollection with reciting that back to him, which would have gotten him in front of the jury. Well, again, he didn't say, I don't remember it. He said, it absolutely didn't happen. And we did actually say we wanted to play it for him, and the judge wouldn't even let us play it for him in the original Azari. Your time has expired. Thank you. Thank you, counsel. We'll hear from the government. Good morning. May it please the Court, Michael Lockhart, assistant United States attorney for the appellee of the United States government. I will just dive in and address the points that the appellant made, unless the Court would like to start. Tell me about Mr. Zarab. Where is he now? Mr. Zarab has pleaded guilty pursuant to cooperation agreements. So he will not go to trial, and he is awaiting sentencing. Does the government take a position on what his sentence should be? It is not the government's practice to take a position on a particular sentence that a cooperating witness should receive, or a cooperating defendant should receive. That is a matter that is entirely up to the discretion of the sentencing judge. As we all know, but sometimes the government puts in a memo. Oh, yes. It is typical to put in a motion for a sentencing reduction pursuant to 5K1.1. It is not typical to recommend a particular sentence, other than to alert the Court to it. I see. Well, proceed. So I'll start with the contention about the jury instructions with respect to the IEPA conspiracy. But before I get there, I do want to make it clear that Mr. Atilla was also convicted, we believe, quite clearly, under the first object of the IEPA conspiracy, which is the conspiracy to cause violations prohibiting the export of money and services out of the United States. I think that's clear from the convictions under the bank fraud, the bank fraud conspiracy, and the money laundering conspiracy counts. The acquittal on the money laundering conspiracy is not an inconsistent verdict. Money laundering, a substantive money laundering conviction, has a different element than a substantive bank fraud conviction. Money laundering requires the defendant conduct a transaction in the United States, whereas a bank fraud conviction requires the defendant participate in a scheme or artifice to defraud. So I think it's quite natural to see the jury as having concluded that Mr. Atilla did not personally participate in a U.S. financial transaction but did conspire to commit. There were no secondary sanctions in place at the time. Is that correct? So the secondary sanctions regime was in place. The secondary sanctions prohibitions had not been imposed on Halk Bank at that time and have not been. But had they been, was it alleged that Halk Bank had engaged in behavior that was subject to secondary sanctions? It was alleged, and I think on appeal, Mr. Atilla does not contest that the evidence is sufficient to show that he, in fact, engaged in conduct to avoid the imposition of the secondary sanctions. He simply contests that that is a crime. The opposing counsel says this is the first time the government has ever sought to punish someone for the crime that it's alleged Mr. Atilla committed, which is preventing the imposition of secondary sanction prohibitions. It is the first time, but I would also note that the relevant executive orders were issued in 2012 and in 2013 and Halk Bank immediately and Mr. Atilla immediately began conspiring to violate those sanctions provisions. So the relevant executive orders are basically coincident. This doesn't go back to the beginning of IEPA. This is new regulations. These are new regulations that were issued in 2012 and 2013. Is that the ITSR set of regulations? The executive orders were implemented into the ITSR. The ITSR had existed since about 1995. I see. And so these are new regulations under ITSR and IEPA, and this is the first time the government had an opportunity? That's correct. To prosecute someone? The first time that we're aware of that a foreign banker and a foreign bank conspired to evade U.S. sanctions to the tune of several billion dollars. Are you taking a position different from OFAC on this? I don't think so. And I think there's sort of a legal order of operations in addressing the statutory interpretation question. First, we don't think it's ambiguous. This is a term, a void, has been applied in the case law for decades before it was incorporated into this executive order in cases like Bando. It's appeared in statutes like applied in super value and other decisions to apply to things that have not been imposed or have not occurred yet. It's part of the dictionary definition that's quoted in Mr. Attila's brief to prevent the occurrence of something. The reason OFAC's historical position is not inconsistent is because OFAC has not interpreted these regulations in this context, in the context of willful conduct to prevent the imposition of sanctions by deceiving the Treasury Department. So as I read the record, it looks like Mr. Attila did not benefit financially from this scheme. Is that correct? So Mr. Attila was not a direct financial beneficiary in the sense of getting a cut of the proceeds or receiving bribe payments. Right. Mr. Zarrab was. Yes, very much so. And some of the other actors. Very much so. So, but Mr. Attila did not become personally, did not get any of the bribe money, any of the cash found in boxes when they did search warrants? That's correct, but that's not. He wasn't innocent, but he didn't profit. Well, he profited in the sense that his bank was able to maintain access to the U.S. financial system while also. Did he get credit for that with Holbeck? I'm sorry? Did he get credit for that, that he kept Holbeck in the system? Well, Mr. Attila was the deputy general manager, which is one level below the chief executive. He was responsible for the international banking department. He had primary responsibility for the bank's relationship with the National Iranian Oil Company and the Central Bank of Iran, as well as its relationship with U.S. correspondent banks in New York. I think Mr. Attila testified in the defense case that if the bank did not have access to U.S. correspondent accounts, his department would not exist. So, yes, it was very important to Mr. Attila personally that this scheme succeed. Although not personally, financially. Professionally, certainly. Professionally. And for his employer and for his government. And he was knowledgeable enough to help Mr. Zarrab avoid some of the, for a while at least, avoid some of the sanctions. That's correct. He was a source of expert advice on how to design the scheme. That's correct. Why did you prosecute him and not Mr. Zarrab? Mr. Zarrab was prosecuted, and he pleaded guilty to participating in the same. Oh, he pleaded guilty. That's correct. All right. So just very quickly, my last point on the interpretation or the jury instructions on IEPA. As I said before, we think that it is the plain meaning of the word avoid. It is the way that avoid has been applied in the sense of future events or events that have not happened, like avoiding a prosecution that has not been brought. And that is an interpretation that has been around for decades. I will address the other issue that the appellant raised about the jail transcript. And I think this argument really is squarely addressed by this Court's decision in Blackwood, where the exact argument that Mr. Attila is raising was rejected by this Court. And the circumstances in Blackwood were that there was a cooperating defendant who apparently was captured on a recorded telephone call telling one of his co-defendants that he had not committed the crimes to which he had pleaded guilty, that he had been offered a suspended sentence in exchange for his cooperation, and that he did not know about the underlying crime that had occurred. The Court found that it was error to have excluded the part about a sentencing leniency promise, a representation from the government about an outcome for his case, but that the cooperating witness's statements about being factually innocent were collateral and that extrinsic evidence about that was properly excluded. And, in fact, offered some observations on the argument that Mr. Attila has advanced that it showed a motive to lie in order to obtain a sentencing leniency. And the Court noted that that was an interpretation that seemed rather far-fetched to believe that a defendant who had pleaded guilty, who had acknowledged having committed the crimes in court, was nonetheless, in fact, factually innocent and making up testimony. He would have entered his plea, I assume, the way we're all practicing. Sorry, the district courts are all practicing now under oath, correct? That is correct. That is correct. And then with respect to the erroneous exclusion of the portion of the call dealing with sentencing leniency, that, of course, is not a portion of the jail call that is at issue in this case. There's no representations about statements by the government to Mr. Zorab about what his sentence would be. It's only the statements, the type of statement, that the Blackwood Court found were collateral and where extrinsic evidence was properly excluded. But I would go on to note that the Blackwood Court also stated the standard to evaluate whether the exclusion was an error and the question is, or whether it was harmless, and the question is whether the jury had ample basis to evaluate possible bias as a result of the witness's cooperation. And here, Mr. Zorab was cross-examined quite extensively about a wide variety of topics, including about the existence of his cooperation agreement, its terms, and any potential bias he might have in favor of the government in his testimony. So under Blackwood, the exclusion was both proper and, if not proper, obviously harmless. Thank you. Unless the Court has any further questions. Thank you, Counsel. Mr. Blackwood, you have two minutes for rebuttal. Thank you, Your Honor. Your Honor, I have, I think, one point I'd like to make with respect to each of the claims or each of the issues. With respect to this idea of harmlessness, Mr. Lockhart, I'm sorry? For which? Harmlessness, I think, applies to both of these arguments. Yeah. For the harmlessness of the secondary sanctions argument where he said they had to convict on the primary sanctions theory, I think that you cannot say beyond a reasonable doubt that they aren't inconsistent for this reason. Because under the bank fraud, he had to be convicted of using one of specified U.S. banks. And under the money laundering conspiracy, it wasn't phrased in exactly the same way, but it was pretty darn close. It was it had to bring money from outside the United States to inside the United States. So I don't think there's really, you can say, oh, well, clearly, you know, there wasn't any inconsistency between they definitely used one of these U.S. banks and, you know, bringing money from outside the United States to inside the United States. And, again, the burden is on them to show beyond a reasonable doubt. And I just don't think you can say that that's been done here. With respect to this question about evade and avoid being different, again, this is the term that has been used again and again, evade or avoid. It's a single phrase. It's set up by commas. It appears in executive orders all the time where it can only refer to prohibitions that are now in place. The government's entire argument is you have to read it to apply to future sanctions because otherwise it would be redundant. And that's just not how it's been used in this entire milieu of regulatory sanctions. And that brings us to, again, Bando is a very different case. Bando is a case where you can say evade or avoid the imposition or evade or avoid prosecution. I guess it's avoid prosecution. But the difference was there are two clauses. One is avoiding prosecution and one is avoiding testifying. And because testifying referred to is charged, I said there was a negative pregnant to say that it had to include things that weren't charged in the first. Language is totally different here. And if I can finish on this last point, which is Blackwood. If you look at it, my understanding of Blackwood, I read it for this argument, is that they did say that this was not collateral, but they said that it was appropriately addressed because the judge explained the reason why he might have wanted to lie. The prosecution exchanged the reasons why he might have wanted to lie. And that simply wasn't done here. If we would have been able to prove not only did he lie to all those other people, the FBI, you know, Turkish investigators, jury, he lied to you, which is a very different thing. And it's the only way we could have addressed his testimony that his cooperation agreement required him to speak exactly the truth. And the worst thing in his life would be that if he made up something about a connotation on the stand because it would jeopardize his ability to get a reasonable sentence. Nothing that we were able to cross-examine him about addressed that. And that is why we deserve a new trial. Thank you. Thank you. Thank you both. Very interesting case. We'll reserve decision. The next matter on our calendar is Christopher Miller v. City of Ithaca. Good morning. Good morning. If it pleases the Court, my name is John Hunt, and I represent the City of Ithaca as well as the other appellants. We're here today because we respectfully submit that the district court erred in not granting the defendant's motion under Federal Rule Civil Procedure 60B for a relief from judgment. The city had requested relief from a judgment that it awarded the plaintiff a half million dollars in attorney's fees and expenses. But the city asked for that relief because the verdict on which the judgment was based or was primarily based was vacated by this court. There were two causes of action, and one was vacated by this court. That's correct, Your Honor. Was that the larger one, would you argue? The more serious? That's correct, Your Honor. There were two claims that resulted in a combined judgment. One was on one claim for retaliation, which the parties referred to below as the notice of discipline claim, and that resulted in a judgment for $260,000. There was a second claim for retaliation based on what's called the BEATS assignments, and that resulted in a judgment for $20,000. When this case was last before the circuit, the circuit reversed the judgment on liability grounds on the notice of discipline claim, which is the bigger one. Because the court had gotten the jury charge wrong. Correct, Your Honor. That's right. Under the Nassar case. But does the fees judgment stand? Yeah. The second, yes, this Court ruled on the parties' challenges to the fee award. The appellant. This is the quote. We affirm the district court's decision as to fees and costs. They didn't splice it. They didn't reduce it. They didn't say go back and take another look in light of the split verdict here on the convictions. I mean, it seems to me that that's pretty clear, isn't it? Well, correct, Your Honor. Although in the actual operative language in the mandate, it says the case is remanded to the district court for further proceedings consistent with the opinion. Right, but consistent with the opinion, it was to affirm the decision as to fees and costs. It seems to me you're really quibbling with the circuit's mandate or the circuit's decision. You came to the right place. Except that it's too late now to fix that, right? Well, Your Honor, we don't believe so. And here's why. We think that the, again, that the language of the mandate sent the case back for a retrial. On one count. On the notice of the correct. But not on fees and costs, right? Well, Your Honor, I think that it necessarily requires a reassessment of the fees and costs. I think that's inherent. And because the standard for awarding fees and costs, one of the critical element of that is a degree of success that the plaintiff achieved during the course of the litigation. And what's happened because of the proceedings in this case is the initial judgment that the district court made on the degree of success is no longer valid. Two-thirds or more of the actual damages are gone. In other words, if Judge Sharp were deciding that issue today, it would be a very different situation. All there would be is $20,000. But this was all before this court or a different panel of this court before, right? You could make that argument then. Oh, Your Honor. Maybe you even did. But this court affirmed the costs and judgment award. Your Honor, what we challenged when the case was previously here was the actual substance of the fee award. And the plaintiff also challenged it. What we didn't foresee was that this would end up in the posture that it is now. And I think that because the way the mandate was written, where it says that it's remanded for further proceedings consistent with the opinion, normally when a ---- I'm sorry to interrupt you. But how do you square the language that I quoted to you with saying that that's open to reconsideration below? Because I think in order to have further proceedings, there's going to have to be another evaluation of the attorney's fees in this case. So what portion of the costs and fees was affirmed by the circuit when it said, we affirm the district court's decision as to fees and costs? I'm not sure that any portion of that actually was. I think that at the end of this ---- Is it an error for this circuit to say that? I'm not sure it was error, Your Honor, but I think what was intended ---- Not error, then what? Pardon? Not error, then what? I think, Your Honor, I think it was ---- I think there was a directive by the court to go back to the district court, retry the notice of discipline claim, which was responsible for the bulk of the damages and the bulk of the fees. And then after, that would finally be the conclusion of this litigation. We've had three trials. And at that point, there would be a full ---- there would be a full examination of the attorney's fees question. Well, that's what you'd like. I just don't see how you can squeeze that out of the language I just quoted you. I mean, you didn't make a motion for reconsideration, right? That's correct, Your Honor. The way we interpreted this was that by sending it back for further proceedings consistent with the order, that that inherently would lead to the vacation of the or vacating of the attorney's fees award. By the district court. Right. Correct, Your Honor. Even though its determination had been affirmed by this court. Correct. Given that it was an ---- yes. Given that it's an ongoing case, I don't think they're going to ---- the district court is going to have any choice. When it goes back for trial, the conclusion of that trial, there's going to have to be another attorney's fees determination. Well, that would be for the fees since the circuit's decision, right? If there's a win. If there's a loss, then not. Well, I think that the original opinion in the case didn't segregate the fees from the notice of discipline claim from the lesser claim, from the beats assignment claim. So the amount you gave us was the damages awarded, but the fees were not so segregated like the damages. The fees were a lump sum. As I recall, I don't think the ---- right. I think, Your Honor, I think the district court made a lump sum determination and then what he did was he went through the different factors and then he applied a percentage reduction. And that's how he arrived at his decision. And when it came up to this court, the parties both sides challenged that analysis, but it was being challenged on the merits. Thank you. You've reserved three minutes for rebuttal. We'll hear from Mr. Miller's attorney. May it please the Court? My name is A.J. Bossman. I'm here on behalf of Christopher Miller, the plaintiff in this action. Do you expect to try, retry the notice of discipline cause of action? Is that the one? For termination, correct. That's the one that this court vacated? That's correct. And you then will ask for fees yet again? For fees subsequent to the remand, yes. The decision that this court made, I think, was clear. The defendants have said that they are seeking clarity, special appendix at 60. Seeking clarity of this court's decision should have been done in the manner of a writ of mandamus or a petition to recall the mandate or a motion for reconsideration. If you take a look at the conduct of the defendants here, I don't think it was so much that they didn't understand what the mandate or the decision said. It was the 15th day that they moved for an extension of the stay of the judgment. Fourteen days they had to seek re-argument. Why request an extension of the stay if they did not understand the mandate? I think that they took the gamble that they were going to get Judge Sharp to extend the stay on the judgment, both for the fees and the compensation. It was Judge Sanis who tried the case, right? The matter was transferred immediately to Judge Sanis upon the application of the defendants to extend the stay. I see. And why? Why was it transferred? I do not have any information regarding that, Your Honor. They also refused to pay the judgment on the work assignment, the bead assignments claim, even though they acknowledged it was due at least as early as March 7th. You mean the damages to Mr. Miller? The $20,000 judgment, that's correct, Your Honor. They have not paid that yet? They did. But three months later, after we went through the execution and sought the order to show cause, the record, Special Appendix 37, they acknowledge that that payment is due, but yet had not paid it. They represented to the court that they were appealing that $20,000 judgment, but they weren't, and the paperwork bears that out. They signaled their intent to seek further review and or appeal, and they said, in Essay 60, all we're seeking is clarification on what we believe was an ambiguous summary order. So if they're seeking clarity from this court, and we say that that's not a collateral order because they can't do it under Rule 60, we say that, okay, this court, and I tried to find this, while the power to act on its mandate after the term expires survives to protect the integrity of the court's own processes, it has not been held to survive for the convenience of the litigants. That's Briggs v. Pennsylvania Railroad Company, 334 U.S. 304 at 306, a 1948 decision. Additionally, whatever is before this Court, the Supreme Court has said, and disposed of by its decree is considered as finally settled. That's N. Ray, excuse me, Sanford, Fork, and Toole in 1895, decision by Justice Gray, 160 U.S. 247. The circuit, they were considering at that point, the Supreme Court, is bound by the execution according to the mandate. That's the mandate rule. The court cannot vary it or examine it or for any other purpose other than execution or give any other or further relief or review it even for apparent error upon any matter decided on appeal or intermeddle with it further than to settle so much has been the case. And so, as far as the jurisdictional issue that's before you in this appeal, we would argue that in the absence of the motion for reconsideration to seek clarity from the Supreme Court and the absence of a motion, I'm sorry, a petition for recalling the mandate, which they certainly could do, there isn't, this is not a collateral order of the type that's contemplated by the courts to provide relief in these circumstances. Ginsburg. So, counsel, I don't disagree or take issue with the citations you bring to us, but speaking for myself only, the thought of getting fees for trying a case a second time after our court vacated that damage award seems a little egregious. That's all I have to say. Your Honor, the defendants themselves concede that the second and third trials had nothing to do with the notice of discipline for termination. They concede that. And they concede that, I can tell you at what page, the page that they concede that at. We're talking now about a fourth trial, right, though? No, I'm saying that they're conceding now that they have, that the second and third trial had nothing to do with the notice of discipline for termination. Right. But isn't that the case that would be tried? No. No. The second and third trials were only for the beats assignments. The adverse action that was determined by the jury and the judgment that was eventually entered, the $20,000 judgment and the attorney's fees, the second and third trials had nothing to do with the notice of discipline for the, not the notice of discipline, the beat assignments, retaliatory conduct. But not the notice of discipline, cause of action, that this Court sent back for retrial. That was tried on the first trial, along with the beats assignment claim. And the plaintiff won a verdict on both claims. They set aside the verdict, liability and damages, on the issue of the beats assignment. We did trial number two. Plaintiff won. We did trial number three. Plaintiff won. We did a segregated damages claim that the plaintiff, which constituted a fourth case, only to do with the beats assignments. So three quarters of what we're talking about here was exclusive to the beats assignments. The first trial also included the beats assignments. Are you expecting a new trial on the notice of discipline? The notice of discipline for termination has been scheduled for trial. Originally it was scheduled for October. But due to defense counsel's schedule. There will be another trial. It's scheduled for February. Yes. Just that issue. Just that issue. And if you win on that one, you're going to seek fees for what you've incurred since the Court of Appeals decision, right? Correct. And I think what you're saying is that the fees incurred prior to the Court of Appeals decision were pretty hard to segregate between the various causes of action because of what you've just described as the different trials. Correct. And if we're going to talk about the merits of the claims at issue here, then it's important to note that a party need not succeed on every issue, nor even the most crucial one. Citing LaRouche v. Kessler, 20 Fed Third, 68 at 71, this circuit, 1994. Carroll v. Blinken, 42 Fed Third, 122, second, 1994. And Texas State. Are these cases all in your brief? No, Your Honor. These are cases I researched after receiving the reply brief. So will you put them in the form of a memo to us? I'd be happy to, Your Honor. Can you do that within five days? Absolutely. And, Counsel, you'll have five days after that to respond to the citation of Kessler. Also, we know that the amount of damages doesn't have to be proportional or because fee shifting has its own values. And, Justice Kagan, recently said in 2016 in Zeng v. John Wiley v. Sons 136 Supreme Court, 1979, applications for attorney fees should not result in a second major litigation, the order and judgment was presented to this court. My grievances with that order and judgment were denied. Their grievances with that order and judgment were denied. The order was affirmed. Now, if the basis of the court's order not to extend the stay, if that's what they're appealing, then that is based upon an abuse of discretion standard. My time has run. Thank you. Mr. Hunt, you have reserved three minutes. Thank you, Your Honor. Just as a point of clarification, and with all due respect to counsel, I believe that the second trial in this case involved a retrial of liability on the Beetz assignment claim, but it actually involved, but then the second half of the same trial involved damages on both claims. So the $260,000 that was awarded came about during the second trial, and then Judge Sharp offered the plaintiff a remediator versus what they've recovered on the Beetz assignment claim at the second trial, or go back for a third trial just on damages on that claim. Well, the plaintiff rejected the remediator that Judge Sharp had offered, so there was a, that's why it was a third trial on that claim. So the City of Ithaca never heard of settling cases? Your Honor, I believe there have been settlement discussions. You know, the parties have discussed settlement. I'm not surprised to hear that. All right, continue. Sorry, just on that same line, and I don't want to know anything about them, but have you been through this court's mediation process? I mean, you folks have been down here a couple of times. I was with you the first time as well as now. Yes, Your Honor. I believe there was a camp conference in the case back when it was up at the circuit the last time. So you did go through that process? Yes, I believe that's right, Your Honor. Thank you. That's all I wanted to know. As the counsel's argument that there's no jurisdiction, we obviously very much disagree with that. We think this is an example where the jurisdiction is conferred under the collateral order doctrine. We have a very separate issue, a very separate claim of right involving the attorney's fees. We also have something that is separate from the main controversy, as evidenced by the fact that we're all going back for another trial. And thirdly, that if there's a disbursement, if we pay the funds over, it would be very, very hard, if not impossible, to ever recover those. So in a sense On what basis would you be recovering them?  It's not decided by the summary order that Judge Sullivan read to you? Your Honor, we believe that that was vacated as part of the remand. But that was part of the order that vacated the one cause of action, but still imposed the fees. Your Honor, I believe that our position would be that under well-established case law, when the case is reimbursed, when the verdict is vacated, the fee award that goes along with the verdict is You cite no such well-established. Well, I think we did cite cases that say that where the verdict or judgment in a case involving fee shifting is vacated, then that naturally follows that the attorney's fee award is vacated. But it doesn't naturally follow in this particular order. Well, Your Honor, our position would be that it follows from the court's direction to Okay. So the thing to have done was to go right back to that panel who issued that order and say, Can you tell us what you meant by giving all the fees and only one cause of action? But that time has long passed. Well, Your Honor, we felt that this would that there would be another proceeding on fees pursuant to the court's instruction on further proceedings. Well, all right. Thank you very, very much. Thank you both. Thank you, Your Honor. We'll reserve decision. The next item on our calendar is Michael Newsom versus several people who are on submission as Thank you. May it please the Court. The killing of Mouth and Jewels was an unreasonable seizure under the Fourth Amendment for three reasons. Under the totality of the circumstances test in the Second Circuit, there was no danger in this case. If you look at the cases decided in other circuits, one of the key things that they look at was whether the dogs posed any danger to the police officers. Here, there was absolutely no danger. In fact, they were killed days after they were seized and days after any legitimate search was conducted in the residence. The second reason is that they also had days to consider the proper course of action in this case. The dogs had been seized by the Humane Society, and then they continued to, you know, reside at the Humane Society, and then the killing occurred after that, days after that. What's the status of the Humane Society, if we can tell from the record, as a state actor? Does it operate to euthanize animals that it's holding just to some separate entity? It must have some authority to do that. It's a little bit difficult to tell from the complaint, but I think what the answer is is that they would be properly characterized as being in a conspiracy with the state. So the legal effect of that is that they can be held liable. Someone told the Humane Society that they can euthanize these dogs, correct? They were instructed by, as far as the record reveals, they were instructed by the police.